**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------X
ERIC BURWELL,                       :
                                        06 Civ. 787(JFK)
    Petitioner,              :

  -against-                        :     **MEMORANDUM OPINION**
                                        **& ORDER**
SUPERINTENDENT of FISHKILL          :
CORRECTIONAL FACILITY
                                    :
    Respondent.              :
------------------------------------X

**JOHN F. KEENAN, United States District Judge:**

## INTRODUCTION

Petitioner Eric Burwell ("petitioner" or "Burwell") brings this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 seeking to overturn his New York State conviction for second degree robbery. He requests relief on the grounds that the trial court wrongfully excluded the testimony of his identification expert; gave jury instructions that diminished the government's burden of proof; and permitted a juror to take notes during trial; and that the prosecution wrongfully denied him the opportunity to testify before the grand jury. For the reasons set forth below, the petition is denied.

## BACKGROUND

**Procedural History**

On February 1, 2002, Burwell and co-defendant Dwayne Brown were indicted in New York Supreme Court, New York County, for robbery in the second degree, in violation of N.Y. Penal Law § 160.10(1). Following a jury trial which concluded on June 26,

2002, both defendants were convicted of the charge. On August 7, 2002, petitioner was sentenced to a determinate term of eleven years' imprisonment. His conviction was affirmed by the Appellate Division on January 6, 2005, and leave to appeal to the New York Court of Appeals was denied. People v. Burwell, 14 A.D.3d 356, 789 N.Y.S.2d 106 (1st Dep't 2005), lv. denied, 4 N.Y.3d 852 (2005). He filed this habeas petition on December 24, 2005.

**Facts**

(a) Robbery and Arrest

The evidence at trial showed that around 10:15 p.m. on January 31, 2002, Claudio Degli-Adalberti, an Italian tourist, headed into the subway station on 103rd street and Central Park West and encountered two men, whom he would later identify as defendants Burwell and Brown. Brown asked Degli-Adalberti for some change and received a dollar from him. Degli-Adalberti and the defendants then descended the subway stairs at the same time. At the bottom of the stairs, Burwell blocked Degli-Adalberti's path and demanded his wallet. A struggle ensued and, ultimately, Burwell grabbed the wallet and fled the subway station with Brown. Degli-Adalberti left the station and called 911.

Around the same time, Allan Botello, a doorman at 444 Central Park West, which is located between 104th and 105th Streets, saw two men rush through the street and unsuccessfully try to enter a cab. Botello watched the two men as they proceeded to head north on Central Park West until they were out of his view.

A radio transmission about the robbery was broadcast around 10:25 p.m. Officers responded to the robbery and found Degli-Adalberti outside 444 Central Park West. There, Degli-Adalberti gave police descriptions of the robbers. These descriptions were then transmitted over the radio: two black men, one "heavy set" wearing black sweats with an orange stripe on the pants, and a thinner man wearing a black, puffy jacket and jeans.

Meanwhile, officers on patrol spotted petitioner and co-defendant a few blocks from the robbery, walking north. After hearing the descriptions of the robbers, the officers apprehended the two men on 112th Street and 8th Avenue. Burwell was wearing a black jacket and black sweatpants with a white stripe on the side of the pants, and a thicker red stripe, that had appeared orange under street light, on the bottom of the legs. Brown was dressed in a black down jacket and dark blue jeans. Officers radioed that there were two possible suspects and asked that the victim be brought to identify them.

The victim was brought to the scene in the backseat of a police car and was told to inform the officers if he saw the two men who had robbed him. The police car went at a "slow crawl" as it approached the intersection where the defendants were apprehended. The car stopped for a short time in front of Burwell, who was standing on the southwest corner with two officers by his side. Degli-Adalberti remained in the car and was approximately seven to ten feet away from Burwell at this time. The car

3

continued at its slow pace to the other side of the street where Brown was standing, also with two officers by his side. Within seconds of seeing Brown, Degli-Adalberti identified the two men as the assailants who had robbed him, and they were arrested.

Afterwards, petitioner alone was brought to 444 Central Park West for the doorman Botello to observe. Earlier that night, Botello had described for police the man with the larger build that he had seen as wearing sweatpants with an orange stripe about two inches wide on the left side of his leg, and the smaller man as wearing a puffy jacket and dark jeans. Botello told officers that Burwell's build and clothing looked the same as the "bigger guy" that he had seen. (Tr. at 429).[1] Upon their arrest, neither petitioner nor co-defendant were carrying money or the complainant's wallet. Officers searched for the wallet in the surrounding area, but it was never found.

(b) <u>Trial</u>

At trial, the defense requested to present an identification expert to testify on three issues: the unreliability of cross-racial identifications, the effects of stress on identifications, and the absence of a correlation between confidence and accuracy in identifications. From the bench, the trial judge concluded that the case would not be aided by the proffered testimony and excluded it. He noted that it was

---

[1] "Tr" refers to the trial transcript.

4

within a trial court's discretion to determine whether the identification expert testimony would assist the jury, citing a New York Court of Appeals case, People v. Lee, 96 N.Y.2d 157 (2001). He pointed out that, although it was a cross-racial identification, the perpetrators were arrested and identified by Degli-Adalberti almost immediately after the crime, reducing the chance of subtle factors of suggestiveness influencing the identification. In addition, the absence of a weapon or life-threatening situation reduced the likelihood that the victim's stress level interfered with his ability to perceive and identify the perpetrators. Furthermore, the corroborative testimony of another witness, Botello, made expert testimony about possible flaws in Degli-Adalberti's identification unnecessary. The judge stated that "None of the usual things that are really distressing red flags in the traditional identification case, in my view, are present here" and concluded that an identification expert would not aid the jury. (Tr. at 6-7). Petitioner objected to the court's ruling.

Degli-Adalberti identified petitioner and co-defendant at trial as the two men who robbed him. He also testified that petitioner's sweatpants looked like those worn by one of the perpetrators, except that the red stripe had appeared orange. Similarly, Botello testified that petitioner was the individual who he had seen wearing the sweatpants with the orange stripe.

On cross-examination, the defense focused on differences

5

between Degli-Adalberti's testimony at trial and at the grand jury. In particular, defense counsel highlighted that he testified to the grand jury that he was "pretty sure" that the defendants were the men who robbed him. (Tr. at 550). In addition, the defense focused on Degli-Adalberti's uncertainty upon seeing Burwell from the police car by underscoring his direct testimony that after seeing Burwell he told officers that "it could be him," and that it was only after he also saw Brown that he identified both defendants as the robbers. (Tr. at 564-65).

Following the close of the government's case, the defense called a licensed private investigator who had previously interviewed Botello about the night of the robbery. According to the investigator's testimony, Botello had told him that the clothing worn by petitioner were "similar" to the clothing worn by one of the men he had seen the night of the robbery. (Tr. at 593).

After the defense rested, it directed the court's attention to a juror who had been taking notes. Co-defendant's counsel requested that the court not allow the juror to take notes or use the notes already taken because no policy about note-taking had been established at the start of trial. The court allowed the note-taking but explained to the jury that a juror's notes were for that individual only, and not a substitute record of the case. The judge also underscored that if the jurors needed any evidence or testimony read back to them, they were to request the information

6

from the official record.

During summations, the defense focused on the victim's ability to accurately identify the defendants beyond a reasonable doubt. Defense counsel emphasized that the incident occurred on a dark night in a residential area without many lights; that the victim saw the perpetrators only very briefly; that he was carrying a heavy backpack; and that he was scared. In addition, they argued that the victim's equivocation before the grand jury, by testifying to being "pretty sure," provided reasonable doubt to the accuracy of his identification. Further, defense counsel reiterated that after seeing Burwell, the victim's initial response was that "it could be him." Finally, the defense stressed that there was no wallet or money found on the defendants to connect them to the robbery.

Following summations, the court instructed the jury on the burden of proof. It explained that the government bore the burden to prove guilt beyond a reasonable doubt, that the jurors were "the exclusive judges of the facts," (Tr. at 706), and that one witness's testimony was sufficient for a conviction if the testimony was persuasive enough to satisfy the jury beyond a reasonable doubt. (Tr. at 712). The judge also reminded the jurors that the two defendants were being tried separately, that each was presumed to be innocent, and that the government had the exclusive and non-shifting burden of proving guilt beyond a reasonable doubt.

7

(Tr. at 713-14). The court then made a distinction between "elements" and "facts", stating that:

> Crimes are defined by elements. The focus of a trial is to determine whether or not the prosecution can prove the elements of a crime beyond a reasonable doubt.
>
> During the course of a trial, things happen. . . . My suggestion is you try to resolve only the things that you need to resolve in order to make a determination whether the People have proven the elements of a charge beyond a reasonable doubt.
>
> A jury makes factual findings. 50.1 to 49.9, factual findings . . . can be made, although they are not established beyond a reasonable doubt.
>
> The elements must be established beyond a reasonable doubt if they're going to be established at all.

(Tr. at 716-17). The judge repeated that the jury should be concerned with whether the government proved "beyond a reasonable doubt the elements of robbery; and, equally, if not more importantly, the accuracy of the identification of Mr. Burwell and Mr. Brown as the person or persons involved in the crime." (Tr. at 717-18).

The court then defined for the jury the three elements of robbery in the second degree-- theft, force and assistance by another person who is actually present-- and reiterated that only if the government proved all three elements beyond a reasonable doubt could the jury convict. (Tr. at 721-22). Finally, the court explained that failure by the government to prove one or more of

8

the elements beyond a reasonable doubt would leave the jury no choice but to acquit. (Tr. at 723). Neither party objected to the court's instruction on the burden of proof.

The judge also instructed the jury about identification cases, and factors for the jury to consider when assessing the credibility and accuracy of the victim's and any other witness's testimony. He told the jurors that when evaluating the accuracy of the identification, they should consider several factors, such as if the witness remembered specific features like body size, skin coloring, or clothing; if the witness gave a description of the perpetrators, and if so, the extent to which the description matched the defendants; and the period of time that the witness observed the perpetrators and from what distance. (Tr. at 720-21). Finally, he told them to contemplate the mental, physical, and emotional state of the witness during their observation and identification, and if their condition affected their ability to observe and remember accurately. (Tr. at 721).

The jury deliberated and returned guilty verdicts against both defendants.

(c) Appeal

Petitioner raised four claims on appeal, all of which were dismissed. People v. Burwell, 14 A.D.3d 356, 789 N.Y.S.2d 106 (1st Dep't 2005). First, he argued that the court deprived him of

9

due process and a fair trial by excluding the testimony of his identification expert. The Appellate Division rejected this claim and held that the trial court "properly exercised its discretion in denying defendants' request to call an expert witness on identification." Id. at 357.

Second, Burwell claimed that the court's jury charge diminished the government's burden of proof by distinguishing between fact-finding and element-finding. Third, he contended that, by permitting jurors to take notes after opening statements, the court violated a New York state rule, 22 N.Y. C.R.R. § 220.10(b). The appellate court found these claims to be "unpreserved" and "decline[d] to review them in the interest of justice." Id.

Finally, petitioner argued that prosecutors violated his right to testify before the grand jury. A state statute, N.Y. Crim. Proc. Law § 190.50, requires prosecutors to provide notice of the grand jury and an opportunity to testify to defendants who have been arraigned in a local criminal court. Petitioner claimed that prosecutors violated his rights under the statute and due process by indicting him prior to his arraignment. The Appellate Division rejected this claim on state law grounds. Petitioner also claimed that N.Y. Crim. Proc. Law § 190.50 was unconstitutional. The court declined to review this claim because it was not preserved, but added that "[w]ere we to review this claim, we would reject it."

10

Id.

Burwell filed a motion for leave to appeal to the New York Court of Appeals, which was denied on April 6, 2005. People v. Burwell, 4 N.Y.3d 852 (2005).

**DISCUSSION**

Petitioner seeks habeas relief on essentially the same four claims that he raised on appeal: (1) that the trial court deprived him of due process and a fair trial by refusing his request to present an expert identification witness; (2) that the court's jury charge, distinguishing between fact-finding and element-finding, diminished the government's burden of proof in violation of his due process rights; (3) that the court erred by allowing a juror to take notes after opening statements, in violation of 22 N.Y.C.R.R. § 220.10(b); and (4) that the government violated his due process right to testify before the grand jury.

**Standard of Review**

The standards for federal habeas review of state court decisions are set forth in 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254. A claim is "adjudicated on the merits," triggering this deferential standard of review, if the state court disposed of the claim on the merits rather than some procedural ground; "the state court need not refer to the federal claim or to federal law." Hines v. Miller, 318 F.3d 157, 160 (2d Cir. 2003) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision "unreasonably applies" established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. The state court's application of the federal law must be "unreasonable" and not merely incorrect or erroneous. Id. at 411.

**Petitioner's Claims**

(1) <u>Identification expert testimony</u>

Petitioner claims that the state court violated his constitutional rights by precluding the testimony of his

identification expert, who would have testified about the unreliability of cross-racial identifications, the effects of stress, and the absence of a correlation between confidence and accuracy in identifications. The Appellate Division affirmed the trial court's decision as a proper exercise of its discretion. This decision was neither contrary to nor an unreasonable application of clearly established federal law.

The compulsory process clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment secure the fundamental right of a defendant to present witnesses in his defense. See Taylor v. Illinois, 484 U.S. 400, 402 n.1 (1988); Chambers v. Mississippi, 410 U.S. 284, 294 (1973). This right includes the right to present expert witnesses. See, e.g., Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001); Agard v. Portuondo, 117 F.3d 696, 705 (2d Cir. 1997). However, the trial court "has broad discretion in the . . . admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985). Moreover, "[e]rroneous evidentiary rulings rarely rise to the level of harm to [the] fundamental constitutional right to present a meaningful defense." Washington, 255 F.3d at 56 (internal quotation marks omitted).

No Supreme Court decision has held that the exclusion of expert testimony on the reliability of eyewitness identifications violates a defendant's constitutional rights. Many federal courts

13

of appeals have held that a trial court has discretion to exclude such testimony if the court determines that it would not be helpful to the jury. See United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999) (affirming the exclusion of expert testimony because, "[b]y testifying that confidence bears little or no relationship to accuracy in identifications, [the expert] would effectively have inserted his own view of the officers' credibility for that of the jurors, thereby usurping their role"); United States v. Serna, 799 F.2d 842, 850 (2d Cir. 1986) (holding that defendant was not entitled to present an expert whose testimony would have "consisted of general pronouncements about the lack of reliability of eyewitness identification, particularly cross-racial identification," much of which was based on common sense, because such testimony would not "have done anything other than to muddy the waters"), abrogated on other grounds by United States v. DiNapoli, 8 F.3d 909, 914 n.5 (2d Cir. 1993); United States v. Hall, 165 F.3d 1095, 1104-05 (7th Cir. 1999); United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997). But see United States v. Brownlee, 454 F.3d 131, 144 (3d Cir. 2006) (finding that district court abused its discretion because "expert testimony was the only method of imparting the knowledge concerning confidence-accuracy correlation to the jury"). And while there has been a trend finding that such testimony generally should be admitted under federal rules of evidence, no cases have held that such testimony is constitutionally required. Cf. Washington, 255

F.3d at 59-61 (finding that the state court's exclusion of expert testimony regarding the suggestibility of child witnesses, though improper, did not amount to constitutional error warranting habeas relief because those issues had been presented to the jury through cross-examination and in defense counsel's summation).

Here, the trial court found that the expert identification testimony would not be helpful for several reasons, including the time proximity between the robbery and the identification, the absence of a weapon or the stress of a life-threatening situation that could have affected the victim's ability to identify the defendants, and the presence of corroborative testimony by a second witness. The court also instructed the jury about some factors bearing on the reliability of eyewitness identifications. In addition, defense counsel attempted to call into question the accuracy of the victim's identification testimony on cross-examination and in closing argument. The Appellate Division determined that the trial court was within its discretion in precluding the proffered expert testimony. Even if incorrect as an evidentiary matter, this decision was not contrary to nor an unreasonable application of clearly established federal constitutional law. See Smith v. Smith, 2003 U.S. Dist. LEXIS 17642, at **43-46 (S.D.N.Y. Sept. 29, 2003) (finding that although the court's exclusion of expert testimony on the reliability of an eyewitness identification was "almost certainly erroneous," it was not an unreasonable application of federal law, because of the

"discretionary nature of the decision, as well as the abundance of decisions that reject expert testimony of this sort").

      (2) The jury charge

Petitioner also contends that, by distinguishing between fact-finding and element-finding, the court's jury charge diminished the government's burden of proof. This claim is denied because it was dismissed on appeal on an independent and adequate state ground. It is well established that, "[w]hen a state court judgement rests on independent and adequate state law grounds, including a petitioner's failure to meet state procedural requirements, a federal court may not consider the petitioner's substantive claims." Perez v. Greiner, 2003 WL 22427759, at *4 (S.D.N.Y. Oct. 23, 2003) (citing Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Jones v. Stinson, 229 F.3d 112, 117 (2d Cir. 2000)). Here, the Appellate Division held that petitioner's jury charge claim was "unpreserved." Burwell, 14 A.D.3d at 357. New York law provides that claims not raised at trial cannot be considered for the first time on direct appeal. See N.Y. Crim. Proc. Law § 470.05(2); People v. Thomas, 50 N.Y.2d 467, 471 (1980). Thus, the dismissal of petitioner's jury charge claim on the ground that he failed to preserve it according to the state's contemporaneous objection rule prevents this court from considering the claim on habeas review.

Even if this claim were not procedurally barred, it would be denied on the merits because the court's jury charge did not

diminish the government's burden of proof. The Supreme Court has instructed that a federal habeas court must evaluate whether the trial court's "ailing [jury] instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). In addition, the federal court must not examine the challenged instruction in isolation, but "in the context of the instructions as a whole and the trial record." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citing Cupp, 414 U.S. at 147). Examining the jury charge as a whole, the federal court must assess "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the standard of proof beyond a reasonable doubt." Vargas v. Keane, 86 F.3d 1273, 1277 (2d Cir. 1996) (internal quotation marks and citations omitted).

Petitioner specifically challenges the following portion of the jury instruction:

> Crimes are defined by elements. The focus of a trial is to determine whether or not the prosecution can prove the elements of a crime beyond a reasonable doubt. . . .
>
> A jury makes factual findings. 50.1 to 49.9, factual findings . . . can be made, although they are not established beyond a reasonable doubt.
>
> The elements must be established beyond a reasonable doubt if they're going to be established at all.

(Tr. at 716-17). While this portion of the instruction could have been clearer, the jury instructions as a whole clearly placed on

17

the government the burden of proof beyond a reasonable doubt. The record shows that the trial judge instructed the jury about the presumption of innocence. He repeated numerous times that the government had the burden to prove every element of the crime beyond a reasonable doubt. In addition, the court specifically noted that the identification of the defendants as the perpetrators had to be beyond a reasonable doubt. Viewing the jury instructions as a whole, there is no "reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the standard of proof beyond a reasonable doubt." Vargas, 86 F.3d at 1277 (internal quotation marks and citations omitted).

> (3) Juror note-taking

Petitioner next claims that the trial court erred by allowing jurors to take notes after opening statements, in derogation of a state law requiring that the decision to allow juror note-taking be made at the start of trial. See 22 N.Y.C.R.R. § 220.10(b). As he did on appeal, petitioner presents this claim as a violation of state and not federal law. Such a claim is not cognizable on habeas review. It is well established that "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Even if petitioner had framed this claim as a violation of federal law, and exhausted it in state court, see Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000), it

18

would be without merit.  Federal courts have recognized that "it is within the trial's court's discretion to allow the jury to take notes." United States v. Marquez, 449 F.2d 89, 93 (2d Cir. 1971); see United States v. Johnson, 584 F.2d 148, 157-58 (6th Cir. 1978) (finding that the trial court did not abuse its discretion by allowing jurors to take and use notes, even though note-taking did not start at the outset of the trial), cert. denied, 440 U.S. 918 (1979).

    (4) Grand Jury

Finally, petitioner charges that he was denied due process because he was not given the opportunity to testify before the state grand jury.  This claim fails because there is no federal constitutional right to testify before the grand jury.  In fact, there is no federal right to a grand jury in state criminal prosecutions. See Branzburg v. Hayes, 408 U.S. 665, 688 n.25 (1972) (citing Hurtado v. California, 110 U.S. 516 (1884)); Fields v. Soloff, 920 F.2d 1114, 1118 (2d Cir. 1990) (noting that the Fifth Amendment right to a grand jury has not been incorporated against the states through the Fourteenth Amendment). "Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court." Davis v. Mantello, 42 Fed. Appx. 488, 491 n.1 (2d Cir. 2002) (citing Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989)).  Therefore, Burwell's claim that N.Y. Crim. Proc. Law § 190.50 is unconstitutional because it restricts when a defendant may testify before the state grand jury

19

is without merit.

CONCLUSION

For the foregoing reasons, Burwell's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. This court will not grant a certificate of appealability because there is no substantial showing of the denial of a constitutional right. Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Petitioner has the right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253; Miller-El v. Cockrell, 537 U.S. 322 (2003). This case is closed, and the clerk is directed to remove it from the active docket.

SO ORDERED.

Dated:   New York, New York
         July 10, 2008

                            JOHN F. KEENAN
                            United States District Judge